E-FILED
Thursday, 05 August, 2021  05:17:55 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| MELISSA K. BYARS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3154 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Melissa K. Byars appeals from the denial of her application for Social Security Disability Insurance under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Byars filed her Brief in Support of Motion for Summary Judgment (d/e 16).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 20).   Byars filed her Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e 21).  The matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner

should be REVERSED and REMANDED for further proceedings before the
Social Security Administration.

## STATEMENT OF FACTS

### Background

Byars was born on March 14, 1967. She graduated from high school
and previously worked as a cashier. She alleged that she became disabled
on March 16, 2016 (Onset Date). She suffered from neuropathy, obesity,
migraine headaches, depression, anxiety, and post-traumatic stress
disorder (PTSD). Certified Transcript of Proceedings before the Social
Security Administration (d/e 11) (R.), 10, 13, 19, 54.

### Evidence Submitted before the Evidentiary Hearing

On December 23, 2015, Byars saw nurse practitioner Jennifer
Walker, NP, in the office of Byars' primary care physician Dr. Nathan
Seaman, D.O. complaining of insomnia. She averaged four hours of sleep
per night and denied any suicidal or homicidal ideations. She also had left
shoulder pain that started when a dog knocked her down in November. R.
405. Walker referred Byars to physical therapy for her shoulder and
prescribed trazadone for her insomnia. R. 405-06.

On July 13, 2016, Dr. Douglas Sullivant, M.D., performed nerve conduction and electromyography (EMG) studies on Byars' upper extremities.  The test results were all within normal limits.  R. 467-68.

On August 1, 2016, Byars saw nurse practitioner Jennifer Walker complaining of increased anxiety.  She was tearful and reported feeling overwhelmed and having bad dreams, poor sleep, and decreased appetite.  She was angry and resentful of other people.  Byars reported suicidal thoughts, but no plan.  R. 470.  On examination, she was oriented and appeared to be in distress; her speech was normal; her mood appeared anxious; and she expressed impulsivity.  Jennifer Walker prescribed lorazepam (Ativan) for anxiety and told Byars to speak to her counselor to help with coping mechanisms and to go to the emergency room if she had thoughts to harm herself or others.  R. 473.

On August 24, 2016, Byars saw her counselor Kettisha Hodges, LCSW.  She was living with her sister and having a hard time.  She took care of the home, and her sister did minimal work around the house.  Hodges noted rapid speech at the time and that Byars had a hard time sitting still.  Byars denied any suicidal or homicidal ideations.  R. 482.

On September 15, 2016, Byars saw nurse practitioner Jennifer Walker.  She reported numbness in her little finger and she had been

unable to sleep due to migraine headaches.  R. 488.  On examination, Byars was alert, oriented, and appeared distressed; her mood appeared anxious. R. 490-91.  Walker prescribed Tylenol with codeine and amitriptyline (Elavil).  R. 491.

On October 28, 2016, Byars saw nurse practitioner Jennifer Walker. Her headaches were under good control with the amitriptyline and it was also helping her insomnia.  She reported that Ativan was not as effective as Xanax in treating her anxiety.  R. 500.  On examination, Byars weighed 176 pounds with a BMI of 29.29; she was oriented and her mood appeared anxious; she had normal range of motion.  Walker prescribed alprazolam (Xanax) for sleep or anxiety.  R. 503.

On December 13, 2016, Byars saw psychiatrist Dr. Erin Humphrey, D.O.  Byars had depression and anxiety.  She was on venlafaxine (Effexor), Xanax, and amitriptyline to help with her mood and migraine headaches, but said her medications were not strong enough.  She reported poor appetite; difficulty sleeping; and feelings of helplessness and hopelessness.  Byers denied any suicidal or homicidal ideations.  She reported trouble with her memory and concentration.  R. 365-66.  On examination, she was alert and cooperative; her mood was not very good, and her affect was tearful; her thought process was circumstantial, jumping

from topic to topic; her insight and judgment were fair, and her memory was intact; her concentration was mildly impaired. R. 366. Dr. Humphreys assessed major depression, recurrent, moderate, without psychotic features; and anxiety. Dr. Humphreys increased the dosage on Byars' amitriptyline and Effexor. R. 366.

On February 4, 2017, Byars completed a Function Report—Adult form. R. 249-56. She lived alone in an apartment and spent her day taking care of her therapy dog, trying "to find things to keep me from crying all day," and performing "light cleaning." Her anxiety affected her sleep. She had no problem performing her personal care. R. 249-50. Byars had trouble remembering things and said she had a healthcare worker write things down for her to help her remember. She prepared her meals in a microwave oven, which cooking took 10 minutes. She did not engage in more complicated cooking because her hands shook. Byars did light cleaning daily and small loads of laundry monthly, but did not do yardwork because she lived in an apartment. She did not want to leave her apartment or be around others. R. 251-52.

Byars stated in the Function Report that she went outside alone daily. She did not drive because she did not own a car and other people drove her places. She shopped for food monthly and could count change, handle

a savings account, and use a checkbook.  R. 252.  Byars' hobbies included

working puzzles in puzzle books, watching television, and playing games

on her phone.  She did not engage in these hobbies very much because

she could not focus or concentrate due to her anxiety and racing thoughts.

Her son visited her about twice a month.  Otherwise, she went out for

doctor's appointments, but she had to write down appointments or she

would forget them.  R. 253.  She did not get along with other family and

friends.  She said, "They are all back stabbing people.  Who are worthless.

Better off without them.  Rather stay home alone."  R. 254.

According to Byars' Function Report, her impairments limited her

ability to lift, squat, bend, stand, talk, remember, complete tasks,

concentrate, understand, follow instructions, use her hands, and get along

with others.  She said her doctor imposed a lifting restriction of five pounds

on her.  She got dizzy squatting or bending and standing hurt her back.

She could not say words correctly or talk fast and she had a hard time

remembering things.  Byars said she could walk two to three blocks without

stopping, and upon stopping she needed to rest for five minutes. R. 254.

She said she could pay attention for two to five minutes and could not

follow written instructions.  She could follow spoken instructions "a little

sometimes;" however, she often forgot what she was supposed to be

doing.  She got along with authority figures, and she could not handle stress or changes in routine.  R. 254-55.

On February 3, 2017, Byars saw nurse practitioner Jennifer Walker complaining of nausea, vomiting, and dizziness.  R. 585.  On examination, Byars was alert, oriented, and her mood appeared anxious; her abdomen exam was normal.  R. 587.

On February 8, 2017, Byars saw Dr. Humphrey for a follow up.  She reported her appetite was good, her sleep was poor, and her medication was partially effective; her energy was low.  She denied any suicidal or homicidal ideations.  R. 565.  On examination, she showed normal appearance, behavior, orientation, speech, affect, thought process, cognition, and insight control; she had low activity levels and fair insight and judgment; her decision making was present. R. 565-66.  Dr. Humphrey discontinued the Xanax prescription and started a prescription for diazepam (Valium).  R. 566.

On February 9, 2017, state agency psychologist Dr. Joseph Mehr, Ph.D., opined that Byars did not have a severe mental impairment.  R. 65-66.

On February 17, 2017, state agency physician Dr. Lee Smith, M.D., opined that Byars did not have a severe physical impairment.  R. 64-65.

On March 30, 2017, Byars saw Dr. Humphrey. She reported that her appetite was fair, her sleep was poor, and her medication was partially effective; her energy was fair to low. She denied suicidal and homicidal thoughts. On examination, Byars had normal appearance, behavior, orientation, speech, thought process, cognition, and impulse control; and her decision making was present. Her activity level was low, her affect was anxious, and her insight and judgment were fair. Dr. Humphrey increased her Xanax dosage. R. 656.[1]

On April 28, 2017, Byars saw nurse practitioner Jennifer Walker. Byars reported that she was seeing a psychiatrist and that was going well and she had a service dog. She was not sleeping well, she had headaches, wrist pain, numbness and tingling in her fingers, and she had difficulty opening lids and gripping small items. R. 689. On examination, she had a positive Phalens test.[2] R. 691.

On May 3, 2017, state agency psychologist Dr. Phyllis Brister, Ph.D., opined that Byars' mental impairments were non-severe. R. 87-89.

---

[1] Dr. Humphrey discontinued Byars' Xanax prescription on February 8, 2017, but the prescription was renewed on March 1, 2017. R. 655. The parties and the ALJ have not cited evidence showing which healthcare professional renewed the Xanax prescription on March 1, 2017.

[2] Phalen's Test is a test to indicate the presence of carpal tunnel syndrome. Dorland's Illustrated Medical Dictionary (32nd ed. 2013) (Dorland's), at 1896.

On May 25, 2017, Byars saw Dr. Humphrey.  Her appetite was good, her sleep was poor, and her medication was partially effective.  Byars had vivid dreams and felt anxious during the day.  She denied any homicidal or suicidal ideations.  R. 1220.  On examination, Byars had a normal appearance, behavior, orientation, speech, thought process, cognition, and impulse control.  Her decision making was present; her activity level was low; her affect was anxious; and her insight and judgment were fair.  R. 1220-21.  Dr. Humphrey discontinued the amitriptyline and prescribed doxepin for sleep.   R. 1221.

On May 26, 2017, Byars saw neurologist Dr. Walid Hafez, M.D., for tremor and memory impairment.  She reported her "comfort level" at 8/10 because her hands shook, and she did not sleep due to vivid dreams.  Byars was ambulatory.  R. 659.  She reported pain in her right forearm because she "tore up a muscle."  Dr. Hafez noted that an MRI of her brain showed T2 signals indicative of migraines.  R. 661.  On examination, Byars had a BMI of 30.  She was alert, cooperative, but very nervous and fidgety.  Her mini mental examination score was 28/30, which Dr. Hafez said was "pretty good."  Her motor strength was good, her sensation was preserved.  Byars' transfer from supine-to-sit and sit-to-stand were normal, and her

ambulation was normal; her Romberg test was normal;[3] her coordination was normal.  Dr. Hafez did not notice a tremor except for "possibly a minimal intention tremor on the left side" during finger-to-nose coordination exam.  R. 661-62.  Dr. Hafez recommended a sleep study and psychiatric care for "her anxiety, her restlessness, and fidgetiness" and prescribed topiramate (Topamax) for her migraine headaches. R. 662.

On June 13, 2017, Byars went to the Emergency Department at Blessing Hospital, in Quincy, Illinois complaining of chest pain.  R. 1151. She was seen by Dr. Isidoros Vardaros, M.D., who commented that Byars was very pleasant and exhibited excellent insight and judgment.  She had chest pain.  She fell recently but was not aware that she hurt her chest. She had pain on inspiration for a few days and said her pain was 2/10, but it had been 6/10 at its worst.  On examination, Byars had chest discomfort; she had adequate gait and station, good muscle tone and bulk, and adequate range of motion in her extremities.  R. 1152.  Lab tests and x-rays ruled out a cardiac cause for the pain.  Dr. Vardaros directed her to follow up to schedule a stress test and discharged her in stable condition. R. 1153.

---

[3] Romberg's test is a neurological balancing test.  Dorland's, at 1715.

On July 7, 2017, Byars saw state agency physician Dr. Vittal Chapa, M.D. for a consultative examination.  She reported that she had depression, and she forgot things.  On examination, she was in no acute distress; she related well to the examination; she was alert, oriented, and tearful.  Byars could bear weight and ambulate without ambulatory aids; her cranial nerves were within normal limits; her motor examination showed no motor weakness or atrophy; and she appreciated pinprick sensation in her extremities.  Byars had no joint redness or heat; her hand grip was 5/5 bilaterally; she could perform fine and gross manipulations with both hands; and straight leg raising tests were negative.  Dr. Chapa's diagnostic impression was history of depression and hypertension.  R. 664-66.

On July 19, 2017, Byars saw Dr. Humphrey for medication management.  She reported that she had continuing nightmares, was moody, did not want to be around other people, and she had crying spells.  On examination, Byars was oriented with normal appearance, behavior, thought process, cognition, and impulse control.  Her activity level was low, her speech was restricted, and her affect was anxious; her insight and judgment were fair; she did not have suicidal or homicidal ideations, delusions, or hallucinations; and her decision making was present.  Dr.

Humphrey assessed depression and anxiety. She changed her sleeping medication from doxepin to trazodone. R. 1217-18.

On August 21, 2017, state agency physician Dr. Henry Rohs, M.D., prepared a Physical Residual Functional Capacity Assessment for Byars. R. 91-95. Dr. Rohs opined that Byars could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently stoop and crouch; frequently climb ladders, ropes, and scaffolds; and she must avoid concentrated exposure to noise and hazards. R. 91-93.

On August 25, 2017, Byars saw Dr. Hafez for a follow up on tremors and headaches. She reported numbness in both hands and feet, and her tremors were worse. She was having more bad days than good days and was "overly tearful because of loneliness." She socialized with people at her apartment building in Country Club Heights; she had a dog which she took for walks. R. 866. On examination she was 64 inches tall, weighed 173 pounds, and had a body mass index (BMI) of 29.7. She was alert and tearful but cooperative. Dr. Hafez noted that strong odors could trigger migraines; her motor strength was good; sensation was decreased to pinprick in glove and stocking distribution; and her reflexes were hypoactive. Byars' coordination was normal without any tremor; her gait

was good; she could not "do heel-to-toe, she would falter."  Romberg test
was negative.  R. 866.

On September 27, 2017, Dr. Hafez performed EMG testing of Byars'
extremities.  She had reported numbness in her hands and feet, a loss of
grip strength, and dropped things easily.  She said she had difficulty
walking, had lost her balance, and had fallen.  The balance problems had
been ongoing for a year and the numbness had been going on for two
months.  R. 862.  The EMG tests showed a tendency for entrapment of the
median nerves at the wrists and entrapment of the ulnar nerves at the
elbows with mild sensory abnormalities; and sensory neuropathies in the
lower extremities.  R. 862.

On January 11, 2018, Byars saw nurse practitioner Jennifer Walker
after a hospitalization from January 4 to January 7, 2018.  She was
admitted to the hospital because she was confused, not oriented, and had
chest pains.  She was put on Effexor at the hospital.  Jennifer Walker
reported that Byars was back to baseline.  R. 813.  On examination, Byars
was oriented, and had a normal mood and affect; her right wrist showed
tenderness and swelling.  Jennifer Walker prescribed tramadol (Ultram) for
the wrist pain.  R. 816.

On January 31, 2018, Byars saw Dr. Melina Djuric, M.D. for depression and anxiety. Dr. Djuric took over Byars' mental health care from Dr. Humphrey. Byars rated her depression at 5/5. She did not like being in crowds, and she had trust issues; she said that Valium was not working; she denied any suicidal or homicidal ideations. R. 1214. On examination, Byars was alert, oriented, with 3/3 recall; her recent and remote memory was intact; her thought processes were logical and goal oriented; insight and judgment were fair. R. 1215. Dr. Djuric assessed bipolar II disorder, generalized anxiety disorder, and borderline personality traits and added lamotrigine (Lamictal) to Byars' medications. R. 1215.

On March 6, 2018, Byars saw Dr. Seaman. She had continuing pain in her right wrist. R. 839. On examination, Byars was in no acute distress, her affect was full, and her mood was pleasant. Dr. Seaman stopped her prescription for gabapentin and started prescriptions for Lyrica and tramadol. R. 839.

On March 21, 2018, Byars saw Dr. Djuric for a follow up. She was doing better since she started the lamotrigine and rated her depression at 3/5. She denied any side effects from the new medication and stated she had no manic or hypomanic symptoms, and no homicidal or suicidal ideations. R. 1211. On examination, Byars was oriented with normal

speech, thought process, cognition, recent and remote memory, and attention; her mood and affect were depressed; her insight and judgment were fair; her decision making was present; she was compliant; and her psychiatric condition was unstable.  R. 1212.  Dr. Djuric increased the dosage of lamotrigine and discontinued the Effexor.  R. 1212.

On June 15, 2018, Byars saw Dr. Hafez for a follow up on her migraines and tremor.  She was ambulatory, alone, and wore a wrist splint. R. 854.  Byars "looked actually great compared to how she was last visit. . . She seemed in fact quite normal, emotions were under control, interaction was good."  Byars was still dropping things.  On examination, her motor strength was good, and her gait was good; she had a positive Tinel's sign at the wrist, but excellent motor strength.[4]  Dr. Hafez assessed "Migraines, seemingly not as much of an issue now.  Depression, seemingly improved. Carpal tunnel syndrome, under conservative care."  R. 856.  Dr. Hafez concluded, "Neurologically speaking, the patient is, in fact, doing pretty well. Right median neuropathy is treated conservatively."  R. 857.

On July 2, 2018, Byars saw Dr. Djuric.  She reported she was increasingly anxious; she was not able to sleep at night; and she had racing thoughts.  She got a seven-day prescription for Xanax from her

---

[4] Tinel's sign is used to test for carpal tunnel syndrome.  See Dorland's, at 1716.

primary care physician. Dr. Djuric told Byars that benzodiazepine, such as Xanax, were not indicated for long-term use. Byars reported that her moods were up and down, and she was feeling increasingly depressed. She denied any homicidal or suicidal ideations. R. 1208. On examination, her appearance, behavior, activity level, orientation, speech, thought process, cognition, recent and remote memory, attention, concentration, and impulse control were normal; her mood was depressed and anxious; her affect was constricted; her insight and judgment were abnormal; her decision making was present; and her psychiatric condition was deteriorating. R. 1209. Dr. Djuric increased the prescription for Cymbalta and started prescriptions for Latuda and Ambien. R. 1209.

On July 5, 2018, Byars saw nurse practitioner Jennifer Walker. She reported that her anxiety was out of control and she felt "like she was going to jump out of her skin." R. 1010. She had decreased concentration and her behavior was nervous and anxious. She said that Xanax helped and asked for a referral to see a different psychiatrist. R. 1011. On examination, she was oriented, her mood was anxious, and her speech was rapid and/or pressured. Walker prescribed Xanax. R. 1014.

On July 10, 2018, Byars saw Dr. Seaman for a follow up for anxiety. She reported that her psychiatrist prescribed Xanax which helped. R.

1018.  Byars had much better quality of life since she started her medications; she reported better sleep and better interest; she denied any suicidal or homicidal ideations; she said her pain medications worked well; and she said she only took pain medications occasionally.  R. 1019.  On examination, Byars was in no acute distress; she ambulated without assistance; and her mood was pleasant, and her affect was full.  Dr. Seaman gave Byars one Xanax tablet.  R. 1019.

On August 10, 2018, Byars went to Clarity Healthcare for a psychiatric diagnostic evaluation with medical services.  She saw advanced practice nurse Matthew Walker.  R. 1265-74.  She was looking for a new provider because she was not getting along with Dr. Djuric.  She had been "crying a lot and very anxious" and she reported going 5-6 days without sleep.  She said that Cymbalta seemed to be working and she took Xanax as needed mostly at bedtime to help her sleep.  R. 1265.  On examination, Byars was cooperative; she had normal eye contact, activity, perception, cognition, intelligence, insight, and judgment; her mood was euthymic; her affect was constricted; her speech was clear; her thought process was tangential; and her thought content was depressive.  R. 1269.  Matthew Walker assessed bipolar II disorder, recurrent severe; PTSD; and borderline personality disorder, chronic.  R. 1271, 1274.  Walker increased

the dosage of lamotrigine and told Byars that benzodiazepines, such as Xanax, were not recommended for PTSD.  He would not prescribe them for Byars, and he encouraged her not to take this medication any longer.  R. 1274.

On September 12, 2018, Byars went to Transitions of Western Illinois for a mental health assessment for counseling.  R. 1344.  She reported feeling sad, depressed, and hopeless; having a poor appetite; trouble falling asleep; feeling tired or little energy; having little interest or pleasure in activities; feeling bad about herself; having recurrent thoughts about death or suicide; experiencing nervousness, anxiety, and worry; having social anxiety; having nightmares; being irritable and short tempered; having mood swings; and avoiding stimuli reminding her of events.  R. 1344.  On examination, Byars was oriented and had normal thought content, thought process, and memory; her affect was angry and depressed, and her speech was fast; her concentration was distractable. R. 1352.  Transitions recommended individual therapy.  R. 1353.

On September 28, 2018, Byars saw advanced practice nurse Matthew Walker for a follow up.  R. 1277-81.  She reported that her mood was stable.  She recently fell tripping over things and into walls and she was taking Xanax at night as prescribed by Dr. Seaman.  Her anger was

decreased significantly and she had no side effects from her medications. She had no suicidal or homicidal ideations. R. 1277. On examination, she was cooperative, and had clear speech, average eye contact, logical thought process, normal cognition, average intelligence, normal insight, and normal judgment. Byars had slowed activity, euthymic mood, constricted affect, and depressive thought content. R. 1278. Walker's assessment of bipolar disorder and borderline personality disorder was unchanged. Walker stated that Byars' level of insight and judgment regarding her behaviors was fair. Walker stated that Byars made some progress and again counseled her about taking benzodiazepines due to her PTSD. R. 1279-81.

On November 6, 2018, Byars saw Dr. Seaman for foot pain and hand pain. R. 1289. On examination, she was in no acute distress; she ambulated without assistance; her affect was full, and her mood was pleasant. Dr. Seaman increased Byars' dosage of hydrocodone and told her to use her Xanax sparingly. R. 1291

On November 8, 2018, Byars had lab tests performed that included a positive result for an ANA screening test. Financial authorization was sought for a rheumatology consult. R. 1326.

On November 21, 2018, Byars saw advanced practice nurse Matthew Walker for a follow up.  1282-87.  She said she was feeling well, and her mood was stable; she had no suicidal ideations; she had some problems sleeping; and she was having more anxiety because of an upcoming court date.  She appeared calm at the office visit.  Walker's review of Byars' reported symptoms stated that she was positive for difficulty concentrating; feeling down, depressed, or hopeless; and having little pleasure in doing things. R. 1283.  On examination, Byars was cooperative; she had average eye contact, clear speech, logical thought processes, normal perception, normal thought content, average intelligence, normal insight, and normal judgment.  She had slowed activity, a euthymic mood, and a constricted affect.  R. 1284.  Walker stated that Byars had fair insight and judgment, and she made some progress.  Walker was worried about her use of benzodiazepines with her opioid pain medication hydrocodone.  He discussed the risk of overdosing on her medications.  R. 1287.

On December 6, 2018, Dr. Seaman completed Medical Source Statement of Ability to do Work-Related Activities (Physical) form.  R. 1338-41.  Dr. Seaman opined that Byars could lift less than 10 pounds, stand and walk for less than two hours in an eight-hour workday, and sit for less than two hours in an eight-hour workday.  Dr. Seaman said that Byars

could sit for 10 minutes before changing positions and stand for five

minutes before changing positions.  Byars needed to walk around three to

four times in an eight-hour workday for five minutes each time.  She

needed to shift at will between walking, sitting, and standing.  Dr. Seaman

said Byars needed to lie down three to four times during an eight-hour

workday.  Dr. Seaman based these opinions on his medical findings of

"fibromyalgia with hypersensitivity and neuropathy in hands, legs."  R.

1338.  Dr. Seaman stated that Byars could never twist, stoop (bend),

crouch, climb stairs, or claim ladders.  The basis for these opinions were:

"Pain with any of those motions Poor balance Weakness in legs/Falls."  R.

1339.  Byars could occasionally reach, handle, and finger objects; but could

never feel and could never push or pull with any extremities.  Dr. Seaman

based these opinions on "Peripheral Neuropathy in hands and feet."  R.

1339.  Byars needed to avoid all exposure to extreme cold and heat; high

humidity; fumes, odors, dusts, and gases; perfumes; soldering fluxes;

solvents and cleaners; and chemicals.  Dr. Seaman based these opinions

on "extreme temps aggravate pain."  R. 1340.  Dr. Seaman opined that

Byers would be absent from work more than four days each month and off-

task at work 25 percent or more of the time during the workday.  Dr.

Seaman said that Byers would need seven to eight unscheduled breaks

during a workday, and she would need to rest for a full day before she could return to work.  Dr. Seaman stated that Byars needed the breaks due to muscle weakness and pain/paresthesia, and numbness.  R. 1340-41.

<u>The Evidentiary Hearing</u>

On January 16, 2019, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  Byars appeared with her attorney.  Vocational expert Bob Hammond also appeared by telephone.  R. 30.  Byars testified that she lived alone in a ground floor apartment.  She had two adult children and two grandchildren, but she did not babysit the grandchildren. She gave up her driver's license in March 2018 because of the side effects of her medications.  Her son picked her up and took her to his house to see the grandchildren and she also got rides from her father and stepfather. Byars completed the 12th grade.  R. 34-36.  She last worked in May of 2016 when she did industrial cleaning at a factory.  R. 38-39.

Byars said she stopped working because she hurt her arm: "I tore 90 percent of my ligament in my right arm and that took me off and then many health issues just started in thereafter."  She did not file a worker's compensation claim for her arm injury.  R. 39.

Byars listed the reasons she could not work:

My anxiety, my insomnia, my peripheral neuropathy with the pain in my legs and from my ankles to my hip and I can't stay

> on my feet very long before they start swelling and it's like a 24-hour Charley horse, being kicked in the shins, and up at the top it's just like you've done squats that you haven't done for 20 years and I deal with that 24/7.

R. 40.  Byars' anxiety caused her to be rude and anxious and also caused insomnia. Racing thoughts kept her up at night.  R. 40.  Her insomnia had been the same since December of 2015.  She did not fall asleep until 3:00 a.m., and she woke up after 30 to 45 minutes, and went back to sleep for another 30 to 45 minutes.  She did not take naps during the day.  R. 42. Byars testified that she sometimes went five days with only 12 minutes of sleep.  R. 43.  She had memory problems which caused confusion.  R. 49. She regularly had panic attacks and crying spells.  R. 50.  She regularly had thoughts of suicide.  R. 50-51.

Byars also suffered from migraine headaches.  She had migraines "for weeks at a time, days at a time."  R. 43.  She estimated that she had four to five migraines a week, each lasting "all day and all night, more than not."  R. 44.  She received Toradol injections for her migraines, sometime twice a day.  She also took hot showers and lay in bed with no lights or sound.  R. 44.

Byars spent her time in bed.  Her legs swelled and were painful if she was on her feet too long.  Once her legs begin to hurt, she had to sit with her legs elevated.  A friend from her apartment building regularly came to

her apartment to visit.  Byars watched television and played solitaire on her phone.  She performed her own personal care, prepared food, and went grocery shopping, but has a friend who does a lot of shopping for her.  R. 41.

Byars said she had neuropathy pain in her hands and feet.  She had stinging, itching, and tingling in her feet and hands and woke up with hot stabbing pains in her feet and her hands itched.  She could stand for 15 minutes.  If she stood that long, she had to elevate her feet to make the pain tolerable.  R. 45-46.

Byars also had tremors in her hands.  She dropped things and knocked things over because of the tremors and the doctors told her the tremors were associated with her neuropathy.  R.48.

Byars said that she took pain medications hydrocodone and baclofen every six hours.  She also took medicine for her diabetes which medication caused diarrhea on an almost daily basis.    R. 47.

Vocational expert Hammond testified.  Byars had no objection to Hammond testifying as a vocational expert.  R. 53.  He stated that Byars' former work as a cashier was generally performed at the light exertional level in the national economy.  R. 53.

The ALJ asked Hammond the following hypothetical question:

Q Okay.  For my first hypothetical, please assume a hypothetical individual the same age, education and past work experience as the claimant.  Further assume that such an individual can work at a medium exertional level as defined in the regulations with the following additional limitations.  Oh, the hypothetical individual can frequently climb ramps and stairs; oh, frequently climb ladders, ropes -- or I'm going to say occasional on ladders, ropes and scaffolds; frequently stoop/crouch.

Oh, frequently handle and finger with the bilateral upper extremities.  Avoid loud noise environment and should avoid hazards such as unprotected heights and moving mechanical parts.  The hypothetical individual is able to complete simple/routine tasks with minimal changes in job setting and duties.  Could such an individual perform any of the claimant's past work?

R. 54-55.

The ALJ defined "loud noise" to include jobs at level four per the U.S. Department of Labor's Selected Characteristics of Occupations (SCO). Hammond opined that such a person could not perform Byars' past relevant work.  Working as a cashier directly with customers was not simple repetitive work.  R. 55.  Hammond opined that the hypothetical person could perform other jobs in the national economy, and representative examples were lamination assembly with 142,000 such jobs in the national economy; food service worker with 180,000 such jobs in the national economy.  R. 56.  Hammond opined that if the same person was limited to light work, she could perform light exertional level jobs in the national

economy, and representative examples were sorter, with 110,000 such

jobs in the national economy; assembler II, with 131,000 such jobs in the

national economy; and mail clerk, with 130,000 such jobs in the national

economy.  R. 56.

Hammond opined that a person performing these types of jobs could

not miss work more than one day a month and a total of 10 days a year.

The person could not be off task more than 10 percent of the time at work.

R. 57.  Hammond said if the person could only occasionally engage in

handling, fingering, and reaching, then the person could not work.  R. 57.

Hammond stated that if the person had to elevate her legs during the

workday, she could not work.  R. 58.  The hearing concluded.

<u>THE DECISION OF THE ALJ</u>

On May 16, 2019, the ALJ issued the decision in this case.  R. 10-21.

The ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Byars met her burden as Steps 1 and 2.  She had

not engaged in substantial gainful activity since the Onset Date, and she

had the severe impairments of neuropathy, obesity, migraines, depression

anxiety, and PTSD.  R. 13.

The ALJ found at Step 3 that Byars' impairments or combination of

impairments did not meet or equal a Listing.  R. 13-14.  In doing so, the

ALJ made findings on Byars' limitations due to her mental health

impairments.  The ALJ found that Byars was mildly limited in her ability to

understand, remember, or apply information.  Medical examination records

noted that her memory was intact.  Byars said in the Function Report that

she could count change, handle a savings account, and use a checkbook.

The ALJ found that Byars had no limitation in interacting with others.  The

ALJ noted that Byars testified and reported in the Function Report that she

visited with her children and grandchildren, as well as people living in her

apartment building.  She also got along well with her healthcare providers,

and she also shopped.  The ALJ found that Byars was moderately limited in

concentrating, persisting, or maintaining pace.  She watched television, she

completed housework, and she took care of her service dog.  Also, Dr.

Humphrey stated at Byars' December 13, 2016 examination that her

concentration was mildly impaired.  The ALJ found that Byars had no

limitation in adapting or managing herself.  Byars said that she took care of

her dog and she took care of her own personal care without assistance.

The ALJ found that Byars' functional limitations due to her mental

impairments did not meet a Listing.  R. 13-14.

The ALJ then determined that Byars had the following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform medium work as defined in 20 CFR 404.1567(c) and
> 416.967(c) except she can frequently climb ramps and stairs
> and occasionally climb ladders, ropes, and scaffolds. She can
> frequently stoop and crouch. She can frequently handle and
> finger bilaterally. She should avoid loud noise at level four per
> the Selected Characteristics of Occupations (SCO). She should
> avoid hazards such as unprotected heights and moving
> mechanical parts. She can complete simple, routine tasks with
> minimal changes in job duties and job setting.

R. 14.  The ALJ relied on medical examination records that showed: Byars

had normal muscle tone and range of motion; Byars could ambulate

without assistance; Byars' medication was effective in controlling her

migraine headaches, anxiety, insomnia, and depression; the second EMG

study showed some neuropathy, but Dr. Hafez found on June 15, 2018 that

Byars was doing well neurologically; and healthcare providers prescribed

conservative treatment for her pain and other physical symptoms.

The ALJ further noted that Byars was receiving unemployment

benefits after the Onset Date and that receipt of unemployment benefits

was inconsistent with Byars' claims of disability because she had to represent to unemployment compensation officials that she was able to work as a condition for receipt of such benefits.  The ALJ stated that the medical evidence and the receipt of worker's compensation did not support "the claimant's allegation of disability."  R. 17.

The ALJ also relied on the opinion. of Dr. Rohs because it was consistent with medical evidence in the record and because Dr. Rohs was a medical expert familiar with Social Security law.  The ALJ gave little weight to the other opinions of state agency healthcare providers Dr. Smith and psychologist Dr. Brister.  R. 18.

The ALJ gave only little weight to Dr. Seaman's December 2018 opinions because:  Dr. Seaman based his opinion on Byars' fibromyalgia, and the records did not contain evidence necessary to establish that Byars had the medically determinable impairment of fibromyalgia; and the evidence in the record did not support his opinion that Byars would be off work more than four days per month.  The ALJ found the opinion that Byars would be off work four days a month to be inconsistent with the medical evidence that showed Byars responded to treatment.  R. 16-17.

After determining Byars' RFC, the ALJ found at Step 4 that Byars could not perform her past relevant work as a cashier.   R. 19.

At Step 5, the ALJ determined that Byars could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 and the opinions of vocational expert Hammond that a person Byars' age, education, work experience, and RFC could perform the representative light jobs pf sorter, assembler II, and mail clerk.  R. 20.   The ALJ concluded that Byars was not disabled.  R. 20.

Byars appealed the ALJ's decision.  On April 20, 2020, the Social Security Administration's Appeals Council denied Byars' request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Byars then filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

In this case, the ALJ did not minimally articulate her analysis of Byars'

statements about pain and other symptoms on her functional ability to

work.  The ALJ is required to assess the claimant's statements about the

effects of the claimant's pain and other symptoms on her functional

abilities.  See 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304,

at *1 (October 25, 2017).  The ALJ recited the Social Security

Administration's two-step process for evaluating a claimant's symptoms.  R.

14-15.  The ALJ, however, did not perform this analysis.  The ALJ did not

discuss any of Byars' testimony, statements in her Function Report, or

elsewhere, about the effect of her pain and other physical symptoms on her functional abilities.  The ALJ mentioned at Step 3 some of Byars' statements regarding the functional effects of her mental impairments.  The ALJ, however, made virtually no mention of Byars' statements about her physical pain and other symptoms and the effect of those symptoms on her functional abilities.

The ALJ made one statement at the end of the ALJ's discussion of the medical evidence and the vocational evidence about Byars receiving unemployment benefits, "In addition to the medical evidence, this vocational evidence does not support the claimant's allegation of disability." R. 17.  The statement refers to a single "allegation of disability," and so, seems to refer to Byars' general allegation of disability in her application rather than her statements about her functional limitations due to her pain and other symptoms.   Even if the sentence referred to Byars' statements about her pain, a single conclusory sentence does not minimally articulate the ALJ's analysis of Byars' pain and other symptoms including her neuropathy, migraines, and mental health issues.

The ALJ was not required to discuss every statement by Byars regarding her symptoms.  Clifford, 227 F.3d at 872.  The ALJ, however, had to acknowledge the claimant's statements of the effects of her pain and

other symptoms and minimally articulate the analysis of those statements. The ALJ failed to do so here. This complete omission requires reversal.

The Commissioner's brief argues that the ALJ clearly rejected Byars' statements because the ALJ relied on medical evidence that was inconsistent with Byars' statements.   The Commissioner may be right, or the ALJ may have not considered her statements of pain and symptoms in reaching the decision.  The Court cannot tell because the ALJ did not mention Byars' statements of her symptoms and pain, particularly her symptoms due to her physical impairments.  The decision failed to minimally articulate the ALJ's analysis of Byars' subjective statements of the limiting effects of her pain and other symptoms.  The omission requires reversal.

THEREFORE, THIS COURT RECOMMENDS that Byars' Brief in Support of Motion for Summary Judgment (d/e 16) be ALLOWED, the Defendant Commissioner's Motion for Summary Affirmance (d/e 20) be DENIED, and the decision of the Defendant Commissioner be REVERSED and REMANDED for further proceedings.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   August 5, 2021

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE